**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| DOLORES LOZANO; | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No.: 6:16-cv-00403 |
| | § | |
| v. | § | |
| | § | Hon. Robert Pitman |
| BAYLOR UNIVERSITY; ART BRILES, | § | |
| in his individual capacity; IAN MCCAW, | § | |
| in his individual capacity; and CITY OF | § | |
| WACO. | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**
**AND JURY DEMAND**

Plaintiff Dolores Lozano through her attorneys, submits this Second Amended Complaint and states the following:

**PARTIES**

1. Plaintiff Dolores Lozano ("Lozano") is an individual who, at the time of the assault complained of herein, was a student attending Baylor University.

2. Defendant Baylor University ("Baylor") is a private educational institution with its campus located Waco, McLennan County, Texas.  Baylor is governed and operated by the Baylor University Board of Regents ("Regents").

3.  Defendant Art Briles ("Briles") was, at all times relevant, the head football coach at Baylor.  Briles was responsible for overseeing all football related activities, and had the

authority to discipline any and all Baylor football players.  As head football coach, Briles was an agent of Baylor.  Briles is named here in his individual capacity.

4. Defendant Ian McCaw was, at all times relevant, Baylor's athletic director.  McCaw was responsible for overseeing all of Baylor's athletic programs, including Baylor's football team.  Based on information and belief, McCaw had the authority to discipline any and all Baylor coaches, as well as any and all Baylor student-athletes.  As athletic director, McCaw was an agent of Baylor. McCaw is named here in his individual capacity.

5. Defendant City of Waco, Texas is a municipality existing under the laws of the State of Texas and can be served with process by serving the City Secretary or the City Mayor at 300 Austin Avenue, Waco, Texas.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the Constitution, laws and treaties of the United States, 42 U.S.C. §§ 1983 and 1988, and over state law claims pursuant to 28 U.S.C. § 1367.

7. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendant resides in this judicial district.

## GENERAL ALLEGATIONS

### The Legal Framework

8. At all relevant times, Baylor received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

9. Title IX protects students from discrimination "on the basis of sex," which includes protection from sexual harassment, sexual assault, and dating violence.

10. In Texas, the statutory definition of "Family Violence" includes dating violence. Tex.

Fam. Code §71.004. In turn, dating violence is defined as an act committed against a victim with whom the actor has or has had a "continuing relationship of a romantic or intimate nature." Tex. Fam. Code § 71.0021.  The term domestic violence is often used in reference to dating violence as well as spousal abuse.

11. The Texas Penal Code criminalizes assault and generally provides that the offense is a Class A misdemeanor. However, if the assault is committed against a person with whom the defendant was in a dating relationship and the assault involves "impeding the normal breathing or circulation of the blood by applying pressure to the person's throat or neck or by blocking the person's nose or mouth," the offense is a third-degree felony. Tex. Pen. Code §22.01(b)(2)(B).

## The Factual Background

12. Lozano enrolled at Baylor in Fall 2010 as a Communication Sciences & Disorders major and was awarded both need and merit-based scholarships and financial aid.

13. For two years, Lozano thrived at Baylor, succeeding both academically and socially.

14. In Spring 2012, Lozano met Devin Chafin ("Chafin"), a prospective Baylor football player, during his recruiting visit to the campus. Shortly after Chafin enrolled at Baylor the following fall, the two began dating. During the next two school years, Lozano and Chafin maintained an on-again-off again sometimes tumultuous intimate romantic relationship.

15. In March and April of 2014, Chafin violently assaulted Lozano on three separate occasions. Each assault left her bruised, battered, fearful and confused. Unbeknownst to Lozano, the assaults she suffered that Spring came at the height of what has now been exposed as a disturbing time in Baylor history marked by violence and cover up at the highest levels.

16. Even before Lozano arrived as an eager freshman in 2010, Baylor was not a safe place for young women. Void of even the most basic standards of support for victims required by state and federal law, Baylor officials had put in place a construct in which sexual

harassment and violence, including dating violence and domestic abuse, was rampant. This case arises from Baylor's deliberately indifferent response to multiple incidents of student-on-student sexual assault, dating violence and domestic abuse and Waco PD's concomitant custom, practice and policy of ignoring victims of domestic violence

17.  Baylor's failure to promptly and appropriately investigate and respond to these assaults fostered a culture and created a condition that substantially increased Lozano's chances of being assaulted along with the numerous other young women who were victimized by Baylor football players.

18. Waco PD, through its policy, practice and custom, further increased the risk of harm to young women in general and to Lozano specifically by mishandling reports of violence against women including sexual assault and domestic violence, failing to properly investigate reports based on gender and gender-stereotypes and taking affirmative action to conceal misconduct by Baylor football players against women.

### THE RISE OF BAYLOR FOOTBALL
### The Bears Enter the Briles Era

19. In September 2003, Baylor hired Ian McCaw ("McCaw") as its new athletic director after Baylor's previous athletic director resigned following an unprecedented scandal that included murder charges against a former Baylor basketball player as well as a tape-recorded plot of Baylor's ex-head basketball coach trying to cover-up major NCAA infractions with a story that the murdered player had been a drug dealer.

20.  In November 2007, Baylor boasted that Art Briles ("Briles") had been hired as its new head football coach. Briles was brought to Baylor to resurrect a long floundering program that had placed last in the conference in 13 of 14 previous seasons.

21. Upon being hired, Briles declared, "What we have to do is win football games. That's our mission."

22. Briles quickly surrounded himself with family and friends. He hired his son, Kendall Briles, his son-in-law, Jeff Lebby, and his long-time friend and colleague from his high school college coaching days, Colin Shillinglaw.

23. Shortly after he arrived at Baylor, Briles rounded out his staff by hiring Baylor's first sports chaplain, Wes Yeary, "to provide counseling and help and a place to go for the young men on [Baylor's] team." Yeary was a Baylor football player himself in the mid-1980's.

24. In February 2008, Briles signed his first recruiting class at Baylor.

25. The 2010 season was the football team's first winning season since 1995 and marked the Baylor's first bowl game appearance in 16 years.

26. The football team's success carried on into the 2011 season, when the team won 10 of 13 regular season games followed by a bowl game win. Robert Griffin III, nicknamed RG3, became the first Heisman Trophy winner in Baylor history and RG3 became a household name.  2011-12 was dubbed "The Year of the Bear."

27. As a result of this sudden success, Baylor football players themselves became larger-than-life celebrities on campus as Baylor football mania consumed the campus to a degree not seen in decades. Then-Baylor President and Chancellor Kenneth Starr ("Starr") who regularly led the football team out on the field, proclaimed that Baylor was entering its "Golden Era."

28. To further this image, Baylor plastered its campus with the images of the school's new heroes—from giant posters of players, to event and game hype, to screen saver images covering student-accessible computers. Baylor was maximizing its football public

relations machine and as a result, daily life for Baylor students was dominated by football.

29.  In response, alumni donations were on the rise. In September 2012, Baylor broke ground on the construction of McLane Stadium, a $266 million state-of-the-art facility.

30. The team's success would continue for the next several seasons. Over the span of four seasons from 2011-2014, Briles' recruits would win an unprecedented 42 football games. Chafin, the star running back who assaulted Lozano, was one of those recruits.

**"Recruiting is what our sport is all about."**

31.  Baylor's image as a conservative Christian institution became central to its recruiting efforts. In 2014, Briles' book, *Beating Goliath: My Story of Football and Faith* was published. Of his goal at Baylor Briles wrote: "We want to be known as one of the best football teams in America. It just so happens that it's a Christian institution, which, by the way, a lot of parents and grandmothers and grandfathers like for their child to be a part of because it is a safe environment. It's an environment where they feel like their children are going to be taken of as a whole spirit. It's a big plus for us, quite honestly, in the recruiting world with moms and dads.  Recruiting is what our sport is all about."

32.  In order to ensure that a last place team could recruit the players needed to win football games, Briles and his staff employed two diametrically opposed recruiting tactics. They emphasized Baylor's purported Christian values to appeal to parents and grandparents while at the same time enticing recruits with decidedly un-Christian activities. To parents, Briles and his staff perpetuated the myth of the "Baylor Bubble," a safe and supportive Christian environment where boys grew into men of integrity. To prospective football players, they offered promises of unrestricted behavior with no consequences,

encouraging players to entertain recruits at off-campus parties involving sex, drugs and alcohol.

33. Baylor's football coaching staff actively implemented these recruiting policies and practices and encouraged the behavior. It has been reported that Assistant Coach Kendall Briles, while recruiting one Dallas area high school athlete asked, "Do you like white women? Because we have a lot of them at Baylor and they love football players."

34.  The "Baylor Bruin" program, like its predecessors the "Baylor Gold" and "Baylor Belles," was a football "hostess" program with the purpose of using attractive female students to escort recruits and their families to campus events and football games on official visits to Baylor.

35. Unofficially, the Bruins are expected to make sure the recruits have a good time by socializing with the recruits, attending parties, and seeing to it that the recruits enjoy their visit to Baylor.

36. Though the Bruins had an official policy of no sexual contact with the recruits or football players, Baylor had an unofficial policy of looking the other way when there was sexual intercourse between the Bruins and the football players.

37. The hostess program, like similar programs around the country, has been criticized for its use of sexuality and the implied promise of female companionship should the recruit choose Baylor. The connection between these hostess programs and sexual violence is well documented. *See Simpson v University of Colorado*, 500 F.3rd 1170, 1173-1184 (10th Cir. 2007).

38.  Through the use of sex with recruits and the continued lure of sex should the recruits attend Baylor, as well as the demonstrated tolerance of illegal behavior, Baylor's recruiting policies

and practices directly contributed to the creation of a culture of violence against women that permeated Baylor and from which Lozano would soon suffer.

## THE CELEBRATION OF VIOLENCE
### The Coaching Staff Created a Culture of Abuse

39.  While Briles' players were being hyped as celebrities on campus and around Waco, behind the scenes the players engaged in more than just sports. From 2009-2015, Baylor football players were responsible for numerous crimes involving violent physical assault, armed robbery, burglary, drugs, guns, and, notably, the most widespread culture of sexual violence and abuse of women ever reported in a collegiate athletic program.

40.  In order to ensure that no one stood in the way of the football program's growing success, Baylor football coaches developed, enabled, and encouraged a culture within the football program in which players were "above the law."

41.  Members of the Baylor football program, including Briles, his son and son-in-law and other assistant coaches, took it upon themselves to handle any would-be disciplinary matters without involving the university's judicial affairs department. The coaches deliberately insulated players from being implicated in any wrongdoing and their efforts were supported and advanced by Waco PD.

42.  In a chapter entitled "*Kid-Saving Business,*" Briles writes in his 2014 book: "I view a significant part of our job as coaches as being in the kid-saving business…. It's our job to fight for them when they make a bad choice….  If they do falter or make a mistake, then we need to save them and give them a chance to get back on the right path."

43.  In several instances when football coaches were alerted to player's misconduct—whether it be rape, dating violence, physical assault, or burglary—the coaches did nothing to investigate the accusations to determine whether their players were

responsible. Further, the football coaches never reported instances of player misconduct to anyone outside of the Athletics Department or made sure the players were disciplined.

44. In still other instances, Baylor, Briles and Waco PD took a more active role in affirmatively covering up transgressions committed by star players. In his 2014 book, Briles boasts about his successful recruitment of Ahmad Dixon, the talented son of a local minister who would go on to be named an All-American. Briles writes about keeping his promise to Pastor Dixon that playing for Baylor would allow his son to "mature in every way" and become a man of character. In his book, Briles asserts that he allows his players room to grow while providing a "safety net." According to Briles, "If you say you are going to help a young man mature, there's a certain point you have to treat him like a man and let him go out there on his own…. .In Ahmad's case, he could handle it."

45. Absent from Briles' book is any mention of the multiple examples of Dixon's violent behavior and misconduct during his time at Baylor. As would be revealed by ESPN in 2016, a Waco PD investigation into a 2011 sexual assault allegation against Dixon was kept open and shielded from public disclosure for more than four years. Dixon told reporters that Baylor coaches called him within a day of the sexual assault incident. The coaches advised him to go to the police station but told him "that they couldn't do much to [him] about it." Police records further revealed a 911 caller reported seeing Dixon pulling the same woman by her hair and shoving her into a car.

46. Waco PD records also reflect Dixon's involvement in a series of fights in May 2011 in which he punched a Baylor student, and a 2013 arrest for assault. Several months after the 2013 assault, he was ejected from a football game for a targeting hit against the

quarterback. The opposing team coach publicly lambasted Briles for failing to discipline Dixon for the assault or the targeted hit.

47. Dixon told reporters the only consequences he suffered as a result of these offenses was in response to the May 2011 fight: Coaches had him perform community service, extra running and clean up duty in weight room.

48. Football coaches and other athletic department staff provided victims misleading or misinformation and took affirmative steps to discourage or intimidate them from reporting instances of sexual assault and domestic violence to anyone outside the Athletic Department – all in effort to maintain the illusion that Baylor was the safe Christian institution it was advertised to be.

49. During the time Lozano was a student and was involved in a relationship with Chafin, Baylor and Waco PD engaged in a practice failing to address and actively concealing from the public specific acts of violence and sexual violence committed by Baylor football players.

50. Baylor set up a construct whereby Baylor athletic staff, Baylor Police Department and Waco PD acted in concert to keep any reports of violence committed by football players from going outside the athletic department.

51. Upon information and belief and based upon media reports and allegations in other litigation, Waco PD cooperated with Baylor to "keep it quiet" and utilized the process of placing cases in "suspended" status to shield reports of sexual assault and domestic violence involving players from public view.

52. Upon information and belief, Baylor failed to report the criminal acts involved in the reports it received in violation of the Clery Act, 20 U.S.C. § 1092(f).

### The Criminal Acts

53. For years, Baylor engaged in a practice of failing to address and actively concealing from the public, specific instances of violence and sexual violence committed by its football players. Examples of just some of these acts of violence follow in ¶¶ 54-65.

54. From 2011 to 2012, Baylor received no less than six reports of sexual assault committed by one football player: Tevin Elliott. Baylor did nothing and Elliott continued to play football. He was finally arrested and his trial in 2014 revealed that he had been accused of rape by three other women and had actually been convicted of misdemeanor assault of another.

55. In 2012, Baylor safety Ahmad Dixon was accused of sexual assault by a woman police say later refused to cooperate with police. Police nevertheless left the investigation open, protecting the details from public disclosure. An ESPN records request later revealed, however, that in 2011, a 911 caller reported seeing Dixon pulling the same woman by her hair and shoving her into a car. Dixon was never disciplined, was touted as a Briles' recruiting success story and was picked in the seventh round of the 2014 NFL Draft by the Dallas Cowboys.

56. Also in 2012, cornerback Tyler Stephenson was alleged to have picked up and threw his girlfriend against the exterior wall of an apartment building. ESPN reported that an arrest warrant was prepared by police, but the case was closed when they were supposedly unable to contact the victim.

57. In 2013, a female Baylor student, Jane Roe 2, reported to Waco police that she had been sexually assaulted by two Baylor football players, former All Big-12 player Tre'Von Armstead and Myke Chatman. The police report associated with the incident indicated

that police had informed Baylor about the incident around the time of the incident. Waco PD took no action. Based on information and belief, despite knowledge of the incident in 2013, Baylor ignored the report, until it finally commenced an investigation two years later on September 11, 2015.

58. As a result of its investigation two years after the incident, Armstead was kicked off of the Baylor football team and expelled from school.  Despite ultimately being found guilty by Baylor's internal investigation process two years later, Armstead was allowed to remain on campus, in good standing, and continue his participation on the Baylor football team for two years following the incident.

59.  Though internal documents uncovered later by ESPN show that Armstead was expelled because of the incident, publicly, Baylor did not disclose the true reason for Armstead's expulsion.  Instead, Baylor announced publicly that Armstead was being disciplined for a "team rules violation."

60.  Elizabeth Doe, Armstead's victim filed suit against Baylor in January 2017.

61. Prior to the 2013 football season, Sam Ukwuachu transferred to Baylor after being dismissed from the Boise St. University football team.  Boise St. University's then head football coach, Chris Peterson, has publicly stated that he informed Briles that Ukwuachu was dismissed from Boise St. due to his violent past.

62. In October of 2013, a female Baylor student, Jane Roe 3, reported to Baylor that she had been raped by Ukwuachu.  Baylor conducted a cursory investigation that "cleared" Ukwuachu of any wrongdoing.  In the meantime, Ukwuachu was criminally indicted for his rape of Jane Roe 3.  Ostensibly because of his pending criminal proceedings, Ukwuachu was not placed on the active roster for the 2014 season.  Baylor did not provide the reason for Ukwuachu's absence from the active roster, instead, claiming that he had been left off the roster for "some issue."

63. Despite his indictment and pending criminal proceedings, Ukwuachu was allowed to remain on campus, unrestricted and was allowed to actively participate in all Baylor football activities, including strength and conditioning and practice, except for actual games.

64. As recently as two months before Ukwuachu's criminal trial, Baylor football's defensive coordinator announced publicly that he expected Ukwuachu to play during the 2015 football season.

65. In August of 2015, despite being "cleared" of any wrongdoing by Baylor's grievance process, Ukwuachu was criminally convicted of raping Jane Roe 3 and sentenced to six months in prison and ten years of probation.

66. Yeary, Baylor's team chaplain, testified on Ukwuachu's behalf at his trial.

67. Baylor settled Jane Roe 3's civil claim prior to Jane Roe 3 filing a civil lawsuit.

68. To date, fifteen women have filed lawsuits alleging that Baylor mishandled their reports of sexual assault and domestic violence and that they were manipulated out of pursuing their legal rights.

## Baylor Controlled the Context of the Abuse and Harassment

69. Baylor had both notice and control over the context of the sexual harassment and violence perpetrated by its football players.

70. Almost all of the football players involved in these assaults were recruited and brought to Waco to play football. Specifically, Devin Chafin was in the 2012 recruiting class and would not have been at Baylor and in Waco but for his status as a football player.

71. Upon information and belief, the Baylor athletic department coordinated housing for the scholarship football players which was almost entirely located in off-campus apartments.

13

72. Upon information and belief, Baylor paid for the off-campus housing, which was the location of two of the three assaults Lozano suffered, by use of a housing stipend credited to the athletes' accounts.

73. Upon information and belief, when necessary, the Baylor athletic department would manage the housing assignments of Baylor football players and require specific housing changes or restrictions.

**THE BAYLOR BUBBLE BURSTS**
**Pepper Hamilton Signals the End of Briles' Golden Era**

74. In the fall of 2015, after learning that Baylor officials had failed to discipline football player and convicted rapist Sam Ukwuachu, Baylor Regents contracted with Philadelphia law firm Pepper Hamilton ("Pepper") for an internal audit of Baylor's Title IX compliance. Pepper Hamilton reported its findings to the Baylor Board of Regents, which in turn published a summary of Pepper's findings (the "Baylor Findings"), confirming that the prevalence of rape and domestic violence within the Baylor football program was widespread.

75. The Baylor Findings were made public May 26, 2016.

76. Pepper found 17 victims of rape or domestic violence involving 19 athletes, including four gang rapes. According to one Baylor regent, Pepper's investigation also showed that some players took part in a horrifying and painful string of sexual assaults over the course of several years.

77. The Baylor Findings also confirmed that a myriad of sexually hostile Baylor policies existed prior to the abuse Lozano suffered. Specifically, the Baylor Findings addressed policies in place between 2012 and 2015.

78. **Policy of No or Little Discipline for Football Players**.

The football program routinely and deliberately failed to discipline players implicated in reports of sexual assaults and domestic abuse. This policy was well documented in the Baylor Findings and was consistent with Lozano's own interactions with the football program. As the Baylor Findings state, "The choices made by football staff and athletics leadership, in some instances, posed a risk to campus safety and the integrity of the University."

79. **Policy of Interference with Female Students' Access to Help Based on Gender and Gender Stereotypes**.

The Baylor Findings state, "In addition, some football coaches and staff took improper steps in response to disclosures of sexual assault or dating violence that precluded the University from fulfilling its legal obligations. Football staff conducted their own untrained internal inquiries, which improperly discredited complainants and denied them the right to a fair, impartial and informed investigation, interim measures or processes promised to them under University policy. In some cases, internal steps gave the illusion of responsiveness to complainants but failed to provide a meaningful institutional response under Title IX." Even where formal investigations were undertaken, the Baylor Findings concluded, "Administrators engaged in conduct that could be perceived as victim blaming, focusing on the complainant's choices and actions, rather than robustly investigating the allegations, including the actions of the respondents."

Lozano's experience is consistent with this finding based on the response she received from Yeary and Baylor counseling staff who focused on her "spiritual self-worth" as a Christian woman rather providing her assistance and support as a victim of domestic violence.

80. **Policy of Enacting a Separate System of Discipline for the Football Team**.

The Baylor Findings conclude that the football program created a separate system of discipline which ignored football player misconduct and fueled the perception that the football players were untouchable: "The football program also operates an internal system of discipline, separate from University processes, which is fundamentally inconsistent with the mindset required for effective Title IX implementation, and has resulted in a lack of parity vis-à-vis the broader student population. This informal system of discipline involves multiple coaches and administrators, relies heavily upon individual judgment in lieu of clear standards for discipline, and has resulted in conduct being ignored or players being dismissed from the team based on an informal and subjective process. The ad hoc internal system of discipline lacks protocols for consistency with University policy and is wholly undocumented. The football program's separate system of internal discipline reinforces the perception that rules applicable to other students are not applicable to football players, improperly insulates football players from appropriate disciplinary consequences, and puts students, the program, and the institution at risk of future misconduct. It is also inconsistent with institutional reporting obligations."

81. **Policy of Not Reporting Allegations of Sexual Assault and Domestic Violence.**

The Athletic Department also had a policy of not reporting instances of sexual and domestic violence to anyone outside of athletics, when it should have reported to appropriate administrators outside of athletics. Again, this policy was documented in the Baylor Findings, which state the consequence of this policy as follows: "As a result, no action was taken to support complainants, fairly and impartially evaluate the conduct under Title IX, address identified cultural concerns within the football program, or

protect campus safety once aware of a potential pattern of sexual violence by multiple

football players." The Baylor Findings additionally state:" Further, because reports were

not shared outside of athletics, the University missed critical opportunities to impose

appropriate disciplinary action that would have removed offenders from campus and

possibly precluded future acts of sexual violence against Baylor students. In some

instances, the football program dismissed players for unspecified team violations and

assisted them in transferring to other schools. As a result, some football coaches and staff

abdicated responsibilities under Title IX and Clery; to student welfare; to the health and

safety of complainants; and to Baylor's institutional values.

82. **Policy of Diverting Cases Away from Student Conduct or Criminal Processes**.

The Baylor Findings state, "Football coaches and staff took affirmative steps to

maintain internal control over discipline of players and to actively divert cases from the

student conduct or criminal processes. In some cases, football coaches and staff had

inappropriate involvement in disciplinary and criminal matters or engaged in improper

conduct that reinforced an overall perception that football was above the rules, and that

there was no culture of accountability for misconduct." This policy of diversion

undermined discipline and added to the culture that football players could be sexually

violent with impunity.

83. **Policy of Not Educating Staff/Students**. **about Title IX**.

Women on campus had no idea what resources were available to them and were unaware

of Title IX or how Baylor's Title IX office could help. The Baylor Findings concluded:

"Baylor failed to provide training and education to students; failed to identify and train

responsible employees under Title IX; failed to provide clear information about reporting

options and resources on campus; failed to have a centralized process for ensuring that all

reports reached the Title IX Coordinator."

84. **Policy of Accepting Football Players with Histories of Violence Toward Women**.

The Baylor Findings demonstrates that the football program had a policy of

accepting high-risk transfers from other football programs without conducting due

diligence:

"Baylor did not consistently conduct due diligence with respect to potential

transfers. In at least one identified instance, the process reflected a failure to

conduct appropriate due diligence and assessment of risk regarding past criminal

or student conduct and an affirmative decision not to seek additional information

about an athlete's prior criminal or student conduct records. Baylor did not adhere

to a consistent protocol regarding transfers and importantly, Baylor did not

consistently follow previously implemented processes regarding criminal

background checks, request for records of any prior college disciplinary actions,

and character reference screening forms."

85. **Policy of "Show 'em a good time" in Recruiting** In addition to the aforementioned

policies which are supported in the Baylor Findings, Baylor also had a "show 'em a good

time" recruiting policy, which included making Baylor Bruins available for sex with

recruits, taking recruits to strip clubs, recruiting based on implied promises of sex with

Baylor women who "love football players," and using alcohol and drugs in the recruiting

process. With knowledge and notice of the inordinate number of assaults, Baylor

deliberately failed to address the risk, as found by the Baylor Findings, which explain,

"Once aware of a potential pattern of sexual violence, the University failed to take

prompt and effective action to protect campus safety and protect future victims from harm. Further, Baylor failed to consider patterns, trends or climate-related concerns that would enable the University to take prompt and responsive action to individual and community concerns. Baylor failed to identify,

eliminate, prevent or address a potential hostile environment in individual cases, and took insufficient steps with respect to both individual complainants and broader community remedies."

86. As Baylor continued to fail to address acts of sexual violence and assault, the football players became increasingly emboldened, knowing that they could break the law, code of conduct, and general standards of human decency with no repercussions. This attitude, in turn, fueled the widespread violence within the program.

87. The Baylor Findings concluded that "Baylor failed to maintain effective oversight and supervision of the Athletics Department as it related to the effective implementation of Title IX. Leadership challenges and communications issues hindered enforcement of rules and policies, and created a cultural perception that football was above the rules."

88. The Baylor Findings demonstrated (a) that the Baylor Athletic Department and football program had policies that led to the assaults of Lozano, and (b) that Baylor was deliberately indifferent to a known and substantial risk of sexual harassment and assault within the football program.

89. On the dates of Lozano's assaults, Baylor was well aware of the risk its recruiting practices and football culture posed to its female students.

90. In at least five instances over the same time period of 2010-2014, the rape

or physical abuse of female students by the football team was reported directly to football coaches and athletic department personnel who took no action.

## CHAFIN'S VIOLENT AND ABUSIVE BEHAVIOR

91. In the Spring of 2012, Lozano attended a pre-game party at a friend's campus-area apartment. There she met Chafin who was a football recruit visiting for the weekend.

92. When Chafin enrolled in Baylor in the Fall of 2012, the two began seeing each other and by the end of 2012 were in a dating relationship.

93. Chafin struggled with drug abuse. Chafin used marijuana, codeine, oxycontin and mushrooms regularly as well as Adderal and Vyvanse prescribed by Baylor team physicians.

94. When Chafin's grades slipped and his eligibility to play football was in jeopardy, Lozano met with Baylor running back coach Jeff Lebby ("Lebby").  Lebby told Lozano that she was a positive influence on Chafin. Lebby enlisted her to tutor Chafin. Lozano agreed to Lebby's request and became Chafin's de facto handler.

95. On one occasion, Lozano and Chafin went to a party where Chafin overdosed on alcohol and oxycodone. Two other Baylor football players, Antwan Goodley and Ahmad Dixon, pressured Lozano not to call an ambulance, convincing her that doing so might negatively impact his football future. Instead, they put Chafin in a tub and revived him with cold water.

96. Recognizing that Chafin needed help, Lozano reached out several times to Lebby to inform him of Chafin's escalating drug use. No action was taken. No one cared what Chafin was doing off the field, so long as he was performing well on the field.

97. In the Spring of 2013, Chafin crashed his car while under the influence of drugs and/or alcohol. After several months of having no transportation, Chafin told Lozano that Lebby helped him replace his car.

98. Chafin lived at University Park apartments, a Baylor-owned complex that housed athletes. Tre'Von Armstead was his roommate.

99. In addition to struggling with drug addiction, Chafin became increasingly physically, emotionally and verbally abusive to Lozano. He shook her, grabbed her and pushed her. She forgave him. He did it again. And again. And again.

100.      As part of a Baylor work-study program, Lozano worked as a paid manager for the Baylor Acrobatics and Tumbling team during the 2013-14 school year. She was in and around the athletic department frequently.

101.      In mid-February 2014, Lozano learned she was pregnant. Chafin and Lozano sat down to discuss their options. She would be graduating in a few months and planned to return home to Houston. Chafin planned to stay at Baylor and continue to play football. After much discussion and with great angst, Lozano decided to terminate the pregnancy. She traveled to Houston the following week for the procedure.

102.      Chafin discussed the pregnancy with Lebby but was not allowed to miss practice to travel with Lozano to Houston. Raised Catholic, the decision to terminate the pregnancy was a very difficult one for Lozano to make and even more difficult to go through alone.

103.      Several weeks later on March 6, 2014, Chafin and Lozano met to discuss the issues they had been going through. After the two ate, they went to Chafin's apartment

where the conversation continued. Two young women were in the living room so Chafin

forced Lozano into his bedroom to talk.

104.     Chafin became very upset when Lozano told him that she was sick of being

mistreated and wanted to be left alone. The discussion evolved into an argument about

Lozano's decision to terminate the pregnancy and Chafin became enraged and violent.

105.     The argument began in the restroom. Chafin slapped Lozano so hard she fell over

the toilet. He repeatedly kicked her in the stomach, forcing her into the adjoining closet

and closing the door. He opened the door, pushed her and tried to punch her but missed,

hitting the wall. He pushed her into his bedroom and she fell against his bed, causing her

to fall to the floor. When she got up a second time, he began to choke her until she could

not breathe. He suddenly released her and began to cry. Upset and embarrassed, Lozano

left through the bedroom window so that the young women in the living room would not

see her.

106.     Lozano suffered physical injuries as result of the assault, including bruises on her

arm, side, back and neck.

107.     Lozano called Chafin's mother shortly after the incident, who pleaded with her

not to involve the authorities. Chafin called Lozano repeatedly, becoming very emotional.

Concerned that he may be suicidal, Lozano returned to the apartment that same night.

108.     When she arrived, Chafin told her he had spoken to Coach Lebby and he felt more

calm after talking to Lebby about what had just happened.

109.     As a result of the traumatic incident and the injuries she suffered in the assault,

Lozano asked for time off from work as a manager of the Acrobatics and Tumbling team.

110.     Acrobatics and Tumbling Coach La Prise Williams ("Williams") noticed Lozano's bruises in practice. In tears, Lozano shared the details of the assault as well as issues related to her relationship with Chafin including the terminated pregnancy. Williams in turn reported it to her supervisor, Baylor Associate Athletic Director and Senior Woman Administrator, Nancy Post.

111.     Williams discussed her concerns that Chafin was abusing Lozano with Post on multiple occasions in March and April 2014. Post responded by discouraging Williams from getting involved, telling her that she had enough to do and that handling incidents like Lozano's was not Williams' responsibility.

112.     Williams also shared her concerns about Lozano with Baylor team chaplain and Director of Sports Ministry Wes Yeary ("Yeary").

113.     With her bruises still visible, Lozano met with Yeary in his office in the Baylor Athletic Department. Lozano again shared the details of the assault, Chafin's abusive behavior and drug use as well as the terminated pregnancy. Yeary told Lozano that she should stay away from Chafin and that she "deserved better." Yeary simply gave Lozano a book by a Christian women's author: "*Restless – You were meant for more*" and told Lozano that he would follow up with Chafin.

114.     Lebby spoke to Chafin about the assault and told him that he should not have laid his hands on Lozano. Lebby punished him for the assault by giving him extra work with weights by "pushing plates."

115.     Chafin told Lozano that both Briles and then Baylor President Ken Starr were made aware of the assault. Chafin told Lozano that both Briles and Starr told him to stay away from her but took no further action.

116.     A few weeks after Lozano's meeting with Yeary, in April 2014, Chafin assaulted

Lozano again.  Chafin approached Lozano is the parking lot of Scruffy Murphy's, a

restaurant and bar frequented by Baylor students. Upset and angry, Chafin slammed

Lozano's hand and arm against an open car window. Several of Lozano's friends and

several of Chafin's teammates witnessed the incident. Another Baylor football player

pulled Chafin away from Lozano so that she could leave.

117.     Lozano sought treatment for her arm at Baylor's on -campus health clinic. She

reported to clinic staff the details of assault along with the previous assault that had

occurred on March 6. She identified Chafin as her assailant.

118.     Baylor clinic staff referred Lozano to the on-campus counseling center to "assist

her in her spiritual self -worth and preservation."  Lozano attended several counseling

sessions during which she shared the details of the verbal and physical abuse and the

assaults. After exhausting her allotment of free sessions, she stopped going to counseling.

No one in the Baylor counseling center ever referred her to outside counseling or offered

her any other resources.

119.     On April 9, 2014, Lozano's mother called Baylor. Call logs reflect she placed

several calls over the course of an hour and a half that morning in attempt to talk to

someone about Chafin's assaults on her daughter. She called the main Baylor number,

then the Director of Operations for Football, and finally the Office of the Dean for the

College of Arts and Sciences.  A woman she spoke with during one of these calls advised

her that the football coaches would handle the situation. She placed another call to the

main number that afternoon. A coach, who she believed to be Lebby, did finally speak

with her and asked her to provide photographs of Lozano's injuries. She complied with

his request and records show that she exchanged text messages with an athletic

department cell phone number identified as belonging to Colin Shillinglaw.

120.       On April 11, 2014, Lozano reported the assault at Scruffy Murphy's to the Waco

Police Department. ("Waco PD"). Officers interviewed Lozano and took photographs of

her arm. She included in the report the first assault that had occurred March 6, 2014 and

forwarded photographs of the bruises she suffered in that assault to police.  One of

Lozano's friends who had witnessed the parking lot assault accompanied her and

provided a statement. Although Lozano was told that an investigator would follow up

with her, she never heard from anyone. Police never interviewed Chafin nor was any

further investigation conducted. Lozano's telephone calls to Waco PD went unreturned.

121.       Later in April 2014, Chafin assaulted Lozano yet again. Following an argument in

Chafin's University Park apartment, Chafin grabbed Lozano and forcibly slammed her to

the ground.

122.       Lozano reported this third assault to Williams.

123.       During this time, as a result of the repeated assaults, Lozano began to feel

hopeless and overwhelmed. She missed classes. Because she was fearful and unable to

concentrate, she was forced to seek an extension to complete assignments and her grades

suffered.

124.       Lozano's final spring semester at Baylor was marred by these traumatic events.

She suffered stress and anxiety and was deprived of the enjoyment of graduation

festivities.

125.       In May 2014, Lozano graduated from Baylor. She moved home to Houston.

126.     With friends still at Baylor, Lozano returned to Waco frequently during the 2014-
15 school year. She attended Baylor football games and saw Chafin occasionally.

127.     During the 2014 season, Chafin played in 9 of 13 games and scored 8
touchdowns.

128.     In January 2015, while in Waco, Lozano returned some football memorabilia to
Chafin at his request. When Chafin became agitated, Lozano attempted leave. As she was
getting into her car, Chafin's then girlfriend attacked her, pulled her by her hair down to
the concrete, ripping her shirt. Chafin's girlfriend began beating Lozano, telling her she
wished she would have killed her. Chafin finally pulled his girlfriend off Lozano.

129.     Lozano called police to report the attack and a friend waited with her until Waco
PD arrived. Still shaken and bleeding from cuts, Lozano explained the entire situation to
one of the two officers, including the previous assaults by Chafin. The officer spoke with
Lozano's mother on the phone at the scene. The officer responded to Lozano
dismissively, making her feel as if she brought the beating on herself by going to
Chafin's apartment. No investigation was conducted and when Lozano went to Waco PD
several months later to provide copies of the medical expenses she incurred as a result of
the assault, she was informed that there was nothing in the police report. It was described
to her as "just like a headline you see in the newspaper" and nothing more.

130.     In July 2015, Lebby called Lozano while in Houston hosting a camp. He asked for
suggestions for restaurants and bars in the area of his hotel.

131.     In August 2015, Lozano applied for a position with Baylor Athletics and
contacted Lebby for a reference. At this point, Lozano had no idea that Baylor had
mishandled her reports of assault nor was she aware of the causal link between her

injuries and the culture of violence that Baylor, including Briles and his staff, had allowed to develop and in fact encouraged. Had she been aware, she never would have applied to work there.

132.     Two years after being reported for assaulting Lozano on three separate occasions, Chafin was finally suspended from the team – albeit for an entirely different non-violent offense that occurred outside of Waco and beyond the reach of Baylor's control. In March 2016, Chafin was arrested in Oklahoma after he was pulled over for speeding while returning from a spring break trip to Colorado. Police found marijuana and an open bottle of alcohol in Chafin's vehicle.

133.     Chafin was suspended from the team but Briles was quoted in a local news story: "He'll be back. It's his first offense in over a four-year period, and he had some bad judgment, just like a lot of us do….It's about representing yourself, your family, the Baylor community and making wise decisions. He's remorseful, but there will also be some punishment phases that go along with remorse."

134.     In mid-May 2016, Lozano was contacted by ESPN reporters in connection with a piece they were doing involving the emerging sexual violence scandal at Baylor. Lozano's April 2014 police report was among those ESPN received in response to a public information request from Waco PD.

135.     Lozano cooperated with reporters and ESPN Outside the Lines ran a news story May 17, 2016, "*Police records detail several more violence allegations against Baylor football players*."  Lozano's April 11, 2014 report was included in the story.

136.     The Baylor Findings were released publicly May 26, 2017 and, for the first time,

the cover up of the violence against women perpetrated by Baylor football players over

the previous five years was exposed.

137.     Chafin was dismissed from the team on June 1, 2016.

138.     In response to the ESPN story, local television station KWTX ran a story on June

7, 2016 that included statements attributed to Waco PD in an attempt to discredit Lozano:

> Lozano reported to Waco police in April 2014 that Chafin grabbed her and
> said her arm was slammed into a car door, authorities said.
>
> They say she also reported that she was choked and slammed into the
> ground in March 2014, but said she had not told anyone about that
> incident.
>
> But police say Lozano refused a protective order and didn't let officers
> take any pictures of bruises on her arm, telling them "she didn't have
> time."
>
> Waco police say she told them she would come the next morning to allow
> them to take photographs but never showed, and never answered their
> follow-up phone calls.

These statements, attributed in another story to Waco Police Sgt. Patrick Swanton, are

false. Photographs were taken. Police did not offer a protective order. Police did not call

Lozano to follow up.

139.     The local television station ran another story that republished these false

statements from Waco PD but this time citing an email Lozano sent to Lebby in

connection with her 2015 application for a job in Baylor's athletic department in which

she praised the athletic department in an attempt to further discredit her. The June 8, 2016

story included publication of  "an email that KWTX obtained dated August 7, 2015."

Upon information and belief, Lebby, or someone within the Baylor athletic department,

provided KWTX the email with the intention of publicly discrediting her and further concealing their misconduct.

140.     Baylor released the following statement in response to media reports of Lozano's assaults:

> "We are committed to learning from the experiences of our students and former students as Baylor implements the improvements identified in the Pepper Hamilton recommendations. Because of the complex nature of dating and domestic violence, even when complainants report abuse to the police, their school and others, complainants may be reluctant to move forward with a campus or criminal investigation. In developing informed and sensitive responses, we must be open to understanding the unique dynamics of dating and domestic violence, including individual barriers and safety considerations, and to supporting our students as they evaluate their options. Further, we are actively taking steps to ensure all of our students understand and trust the full range of resources available to them."

Absent from the statement is any denial that Baylor officials knew about Chafin's assaults on Lozano.

## THE WACO POLICE DEPARTMENT AND DOMESTIC VIOLENCE

141.     The domestic violence in Texas statistics are staggering. According to the National Coalition Against Domestic Violence,

- In 2014, Texas domestic violence hotlines answered 185,373 calls.
- In 2013, there were 76,704 reported victims of abuse by current or former spouses.

- In 2012, 114 Texas women were killed by intimate partners, more than 10 percent of the national total.

- 75 percent of Texas 16-24 year olds have either experienced dating violence or know another young person who has.

- Intimate partner violence accounts for 15 % of all violent crime.

- 72 percent of all murder-suicides involved an intimate partner; 94 percent of these victims are female.

- 85 percent of domestic violence victims are women.

142.     Upon information and belief, and based on statistical information posted online by Waco PD along with media reports, Waco PD has a practice of failing to respond to, investigate and properly report calls related to domestic violence against women.

143.     According to a news article published in the Baylor Lariat on May 2, 2014, "Waco works to batter domestic abuse," Waco PD received 400 to 500 phone calls reporting domestic violence in the month preceding the article. The article noted that this number did not include other calls that turned out to fit the statutory definition of domestic or family violence.

144.     For the month of April 2014 -- the month referenced in the Baylor Lariat article, and coincidentally the month in which Lozano reported two incidents of domestic violence -- Waco PD statistics published on the department's website reflect a city-wide total of 181 assaults of which 110 were coded as family violence.

145.     Lozano's April 11, 2014 report is identified by Waco PD in its statistical report as assault, 3F-FV, which indicates that the offense was third- degree felony family violence.

146.     In response to a public information request, Waco PD produced only two pages of the three-page report related to Lozano, containing only a "Corrected Copy" of the narrative portion of the report which reads in full: "On 04-11/2104 (sic) at approximately 1235 hours I was dispatched out to the front desk of the Waco Police Department in reference to an assault. Dispatch advised there was a female at the front desk who was

wearing a hospital name band and wanted to report an Assault." The report indicates it was taken by Officer Kurt Morsbach.

147.     As alleged in ¶ 128, Waco PD issued false statements to the media in an attempt to discredit Lozano and explain why it failed to take any action on Lozano's report of a felony assault.

148.     As revealed in ESPN's investigation, Waco PD maintained a 2011 sexual assault allegation against a football star in suspended status and therefore shielded from public view for more than four years. When ESPN questioned the investigation, Waco PD could not answer why there was such a lengthy period of inactivity; yet, Waco PD provided a statement the media that the complainant was "deceptive," her claims of sexual abuse and domestic violence were "not believable" and that she and her family had a long criminal history.

149.     Upon information and belief, during the time Lozano was a student at Baylor and a resident of Waco, Waco PD routinely discouraged, manipulated and intimidated women from pursuing complaints of domestic violence.

150.     Upon information and belief, during the time Lozano was a student at Baylor and a resident of Waco, Waco PD routinely discounted, discredited and dismissed women who reported that they were victims of sexual assault and domestic violence based on gender and gender stereotypes.

151.     Upon information and belief, during the time Lozano was a student at Baylor and a resident of Waco, Waco PD routinely intentionally disregarded complaints of sexual assault and domestic violence and chose not to even investigate women's claims of domestic violence based on gender and gender-stereotypes.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF GENDER**
**IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX)**
**(AGAINST DEFENDANT BAYLOR)**

152.     Lozano incorporates all paragraphs of this Complaint is if fully set forth herein.

153.     Baylor's acts and failures to act perpetrated against Lozano amounted to unlawful sexual harassment and discrimination on the basis of gender.  The harassment and discrimination was sufficiently severe and pervasive to create an abusive, and sexually hostile educational environment for Lozano.  One or more Baylor administrators or officials, with authority to take corrective action on Lozano's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies.  Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.  As a result, Lozano was subject to continuing harassment and a loss of educational opportunity.

154.     Additionally, and/or in the alternative, Baylor failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of gender based discrimination that Lozano suffered.  This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful gender based discrimination. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.  As a result, Lozano was subject to continuing harassment and a loss of educational opportunity.

155.     Prior to the assaults by Chafin, Baylor had actual knowledge that sexual misconduct, dating violence and domestic abuse was pervasive among its football program.  Defendant Baylor, its Athletic Department and its football program demonstrated a policy and practice of: recruiting or otherwise retaining, and failing to adequately supervise, football players with a history of violence and sexual misconduct;

covering up sexual misconduct, including dating violence and domestic abuse by its football players; failing to report sexual misconduct and other violent offenses committed by football players to law enforcement or relevant Baylor administrators; engaging in ad-hoc, internal disciplinary procedures that resulted in a lack of discipline for football players that engaged in sexual misconduct; engaging in unequal investigatory procedures that improperly favored male football players accused of engaging in sexual misconduct and domestic abuse over their female student victims; discrediting female student victims of sexual misconduct and domestic abuse committed by football players; tolerating and tacitly approving sexual violence and domestic abuse committed by football players; creating an atmosphere whereby the rules applicable to all students did not apply to football players. Baylor acted with deliberate indifference by acting clearly unreasonably in response to this knowledge.

156.    Baylor acted with deliberate indifference in deviating significantly from the standard of care outlined by the Department of Education in the Dear Colleague Letter of 2011 and Baylor's own policies.

157.    As a result of Baylor's deliberate indifference, Lozano was forced to endure a sexually hostile environment on campus and was made vulnerable to further harassment and assault. After reporting her assaults, she did in fact further harassment and assaults.

158.    As a result of Baylor's indifference, Lozano suffered loss of educational opportunities and/or benefits.  Lozano has incurred, and will continue to incur, attorney's fees and costs of litigation.

159.    At the time of the allegations contained herein, Lozano was unaware, nor with reasonable diligence could have been aware, of Baylor's institutional failings with respect to their responsibilities under Title IX because Baylor actively concealed its own misconduct.  Lozano first learned about Baylor's institutional failings under Title IX in May of 2016 when the Pepper report and Baylor Findingswere released publicly.

160.    At the time of the allegations contained herein, Lozano was unaware of Baylor's

pervasive failings with respect to its response to a known issue of sexual misconduct and domestic violence within its football program dating back several years prior to Lozano's assault.  Because Baylor actively concealed this information from Lozano and the general public, Lozano could not, with reasonable diligence, have learned this information independently.  Lozano first became aware of Baylor's deliberate indifference to a known issue of sexual misconduct within its football program in May of 2016 when the Pepper Finding of Fact was released publicly.

161.     With respect to Lozano's heightened risk claims, Lozano had no reason to know of Baylor's alleged causal connection to the domestic violence and assaults she suffered until the spring of 2016, when media reports regarding the rampant nature of violence and sexual assault on Baylor's campus first came to light. Therefore, Lozano's claims for heightened-risk liability did not accrue until May 26, 2016. Accordingly, Lozano's heightened-risk claims are timely.

### SECOND CAUSE OF ACTION
### NEGLIGENCE
### (AGAINST DEFENDANTS BAYLOR, BRILES AND MCCAW)

162.     Lozano incorporates all paragraphs of this Complaint as if fully set forth herein.

163.     At all times relevant, Defendants Baylor, Briles and McCaw owed extensive duties to supervise Chafin and protect Lozano from his abuse. A special relationship existed between Baylor and Chafin as a scholarship athlete that gave rise to duty to train, supervise and control his actions to prevent harm to third parties. Defendants Baylor, Briles and McCaw also owed duties to competently supervise Baylor's Football program and Athletics Department and to train and educate Baylor's employees.  By enlisting Lozano to tutor Chafin and otherwise manage his behavior as a de facto extension of the coaching staff, Defendants Baylor, Briles and McCaw voluntarily undertook additional duties to protect Lozano, and took actions that increased the likelihood that Lozano, and

other female students, would be verbally abused and physically assaulted by Chafin or other student athletes.

164.    Defendants Baylor, Briles and McCaw  also had a duty to take reasonable protective measures to protect Lozano and other similarly situated students from the risk of domestic violence, sexual abuse and/or sexual assault, such as the duty to properly warn, train or educate Lozano and other students about how to avoid such a risk.  This created a special relationship between Defendants Baylor, Briles and McCaw and Lozano who was entrusted to Defendants' care.   Defendants Baylor, Briles and McCaw voluntarily accepted the entrusted care of Lozano.

165.    Defendants, Baylor, Briles and McCaw, by and through their agents, servants and employees, knew or reasonably should have known of Chafin's dangerous and exploitive propensities, and the prevalence of sexual assault and retaliatory conduct against reporters of sexual assault at Baylor and other universities and/or institutions of higher learning.  With this knowledge, it was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to students, including but not limited to Lozano, female students would be vulnerable to sexual assault, domestic violence and retaliatory conduct by Chafin and others.

166.    By instituting and maintaining an "ad hoc, internal system of discipline" for football players, including Chafin, and by conducting untrained, flawed, and biased investigations Defendants "reinforced the perception that rules applicable to other students are not applicable to football players" and thereby affirmatively increased the likelihood that Lozano, and other female students, would be assaulted by football players, who knew they were unlikely to face any repercussions from their actions.   By voluntarily entering an affirmative course of action affecting the interests of Lozano, Defendants assumed a duty to act with reasonable care.

167.    Defendants failed to ensure that University employees involved in responding to allegations of sexual assault of students were trained and educated to competently

respond to allegations under Title IX. And, by instituting and maintaining an "ad hoc, internal system of discipline" for football players, including Chafin, Defendants additionally assumed a duty to ensure that the individuals implementing that system were properly trained and educated.

168. Defendants, by and through their agents, servants and employees, were acting within the course and scope of their employment at all times relevant and breached their duty of care to Lozano through the acts and omissions described herein, and by deviating significantly from the standard of care outlined by the Department of Education in the Dear Colleague Letter of 2011.

169. Defendant Briles and Defendant McCaw breached their duty of care by engaging in conduct including, but not limited to:

a. Failing to properly train and/or educate student-athlete members of the Baylor football team regarding sexual misconduct and domestic violence;

b. Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;

c. Failing to implement safeguards for female students adequate to protect them from foreseeable sexual assaults and domestic violence by student-athlete members of the football team;

d. Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes;

e. Failing to monitor or supervise Chafin, despite their knowledge that he suffered from drug abuse and addiction and was verbally and physically abusive to Lozano.

f. Failing to competently investigate allegations Chafin had verbally and physically abused and assaulted Lozano;

g. Sanctioning and carrying out untrained, informal investigations of reports that Chafin and other football players have committed sexual violence;

h.   Using untrained, informal investigations of reports that Chafin and other football players had committed sexual assaults and domestic violence as a means of creating the appearance that Athletic Department and football staff were responsive to such complaints, while actually improperly discrediting complainants and allowing football players to escape responsibility;

i.   Failing to train football and Athletic Department staff to competently respond to allegations of sexual assault and domestic violence by football players; and

j.   Failing to require football and Athletic Department staff to report allegations of sexual assault by football players to an appropriate University contact.

170.   Defendant Baylor breached its duty of care by engaging in conduct including, but not limited to:

a.   Failing to assure adequate staff training to meet the behavior and social needs of all individuals, including sexual assault and domestic violence victims;

b.   Failing to train faculty and staff to respond to allegations of sexual assault and domestic violence in a manner consistent with Title IX;

c.   Failing to implement a system to screen prospective faculty and staff training history;

d.   Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes;

e.   Failing to properly train faculty and staff to screen the backgrounds (criminal and social) of student athletes that are recruited to play sports at the University;

f.   Failing to properly train and/or educate the faculty and staff responsible for caring for recruiting student athletes with criminal and anti-social backgrounds;

g.   Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;

h.   Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities;

i.  Sanctioning and carrying out untrained, informal investigations of reports that Chafin and other football players have committed sexual assault and domestic violence;

j.  Using untrained personnel, and informally investigating reports that Chafin and other football players had committed sexual assault and domestic violence as a means of creating the appearance that Athletic Department and football staff were responsive to such complaints, while actually improperly discrediting complainants and allowing football players to escape responsibility;

k.  Failing to train football and Athletic Department staff to competently respond to allegations of sexual assault and domestic violence by football players; and

l.  Failing to require football and Athletic Department staff to report allegations of sexual assault and domestic violence by football players to an appropriate University contact;

m.  Failing to provide supervision and training in administration of counseling of victims of sexual assault and domestic violence following an attack (to wit: having a counselor encourage a victim to refrain from reporting her attack); and

n.  Ratifying the sexual misconduct and violent assaults committed by student athletes by University officials by failing to discourage such behavior in prior instances.

171.  But for the intentional and negligent acts and omissions of Defendants Baylor, Briles and McCaw and their violations of the standards of care and statute set forth herein, Lozano would not have been injured.  Defendants' intentional and negligent acts and omissions therefore amount to negligence, negligent failure to warn, train and/or educate, and negligence per se.

172.  As a result of the above-described conduct, Lozano has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Lozano's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

173.     Lozano incorporates by reference all preceding facts and allegations set forth above.

174.     Lozano's post-reporting Title IX claim and her negligence claims are based on Defendant Baylor's, Briles' and McCaw's affirmative involvement in manipulating and misinforming Lozano of her rights or lack thereof, discouraging Lozano from taking further action with respect to the domestic violence she suffered and concealing Baylor football players' and school officials' misconduct with respect to Chafin's violent assaults of her.

175.     Here, there is no evidence that Lozano knew or had reason to know of Defendant Baylor's, Briles' or McCaw's affirmative misconduct until May 26, 2016, when Baylor released its Findings of Fact and Pepper Hamilton's recommendations.

176.     Lozano neither knew nor had reason to know that Baylor officials were engaging in affirmative conduct whereby they manipulated and misinformed sexual assault and domestic violence victims, including Lozano, discouraged victims from taking further action with respect to sexual assaults, and concealed Baylor football players' and school officials' misconduct with respect to the reporting and handling of sexual assault cases.

177.     In fact, several Baylor Board of Regents members have conceded that even the

Board of Regents was "largely unaware of the extent of the football program's shortcomings in responding to Title IX and sexual assault complaints until an August 2015 Texas Monthly article made alarming allegations." In May of 2016, the Board of Regents members were "horrified and stunned" when Pepper Hamilton's investigation "uncovered evidence that Briles, Shillinglaw, and others in the football program had developed, enabled, and encouraged a culture within the football program that deliberately insulated players from the normal University disciplinary process."

178.      Board of Regents members have likened the Baylor football program to a "disciplinary black hole." If the Board of Regents neither knew nor had reason to know of Baylor officials' affirmative misconduct in handing sexual assault claims involving football players, it goes without saying that Lozano herself would not know nor have reason to know of this information prior to May of 2016.

179.      At no point in time prior to May of 2016 did Lozano understand that Baylor's deliberate indifference to her reports was the cause of Lozano's post-reporting injuries nor could Lozano reasonably have been expected to "inquire further."

180.      Therefore, the statute of limitations on Lozano's post-reporting Title IX claims and her negligence claims are tolled by fraudulent concealment and equitable estoppel. Accordingly, her claims are timely.

**THIRD AND FOURTH CAUSES OF ACTION**
**42. U.S.C § 1983**

**THE FOURTEENTH AMENDMENT**
**OF THE UNITED STATES CONSTITUTION**
**(DEFENDANT CITY OF WACO/WACO PD)**

181.     Lozano incorporates all paragraphs of this Complaint is if fully set forth herein.

182.     By its conduct, acting under color of state law, Waco PD is liable under 42 U.S.C. § 1983 for violating Lozano's rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution

183.     One of the primary functions of law enforcement, including Waco PD, is deterrence of crime. Active investigation and resolution of sexual assault and domestic violence cases serve to deter past and potential offenders from perpetrating sexual assault and engaging in domestic violence in the future.  By deterring future crimes against women, law enforcement protects women from future harm.

184.     Waco PD had a duty to diligently investigate all crimes, including sexual assault and domestic violence reported by women. Defendant breached this duty by routinely and systematically failing and/or refusing to commit human or financial resources to do so.

**EQUAL PROTECTION**

185.     At all relevant times, City of Waco, acting through Waco PD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to Lozano's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

186.    In May 2016, Lozano learned that Waco PD had a custom, policy and practice of failing to properly record, process, and investigate reports of sexual assault and domestic violence against women based on gender and gender-stereotypes.

187.    In May 2016, Lozano learned that Waco PD had a custom, policy and practice of informing  Baylor of misconduct by male football players before and/or in lieu of taking action and often either refusing to undertake investigations or suspending investigations in an effort to conceal information from the public.

188.    In May 2016, Lozano learned that Waco PD had a custom, policy and practice of discounting, discrediting and dismissing women who reported that they were victims of sexual abuse and domestic violence based on gender and gender-stereotypes.

189.    Until Lozano was contacted by news reporters in May 2016 after they received a partial copy of her April 2014 report of domestic violence, she was unaware of Waco PD's unlawful customs, policies and practices and was unaware of the causal link between these unlawful actions and the assaults she suffered while a student of Baylor and a resident of Waco.

190.    Waco PD continued acting unlawfully in further violation of Lozano's constitutional rights when it, through its spokesperson Sgt. Patrick Swanton, made false statements to the media in May 2016 in an effort to continue concealing its discriminatory actions against Lozano.

191.    By its conduct, acting under color of state law, Waco PD is liable under 42 U.S.C. § 1983 for violating Lozano's rights under the Equal Protection Clause of the Fourteenth Amendment.

192.    Waco PD's unlawful actions were committed willfully, knowingly and with specific intent to deprive Lozano of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

193.     The constitutional injury inflicted by Waco PD was caused by a person(s) with final policy making authority.  Now retired Chief Brent Stroman was police chief during all relevant times and upon information and belief Lozano alleges that Stroman knew about the above described conduct, facilitated it, condoned it, and/or turned a blind eye to it.

194.     In the alternative, Waco PD's actions and inactions demonstrate a continuing, widespread and persistent pattern of constitutional misconduct that constitutes an unofficial policy, custom or practice.

195.     As a result of Waco PD's violation of Lozano's constitutional right to Equal Protection, Lozano is entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses.

## SUBSTANTIVE DUE PROCESS
### Right to Personal Security and Bodily Integrity

196.     At all relevant times, City of Waco, acting through Waco PD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to Lozano's constitutional rights under Due Process Clause of the Fourteenth Amendment to the United States Constitution.

197.     Waco PD engaged in a custom, policy and practice of failing to properly record, process, and investigate reports of by victims of sexual assault and domestic violence.

198.     Waco PD ignored, discredited and discounted women who reported that they were victims of sexual abuse and domestic violence.

199.     Waco PD's failure to properly investigate and take action on reports of sexual assault and domestic violence, including Lozano's report, emboldened and empowered assailants, including Chafin, to repeat their crimes and rendered victims, including Lozano, more vulnerable to danger.

200.    Waco PD routinely failed to provide victims of sexual assault and domestic violence, including Lozano, with appropriate resources and failed to inform victims, including Lozano, of options for protective orders or other measures to ensure their safety.

201.    Waco PD's unlawful policies, practices and/or customs included the failure to properly hire, train, and retain officers charged with handling complaints of sexual assault and domestic violence. Waco PD was deliberately indifferent to Lozano's rights under the Due Process Clause of the Fourteenth Amendment by

> a. Failing to properly hire officers and staff with the appropriate background, training and experience to respond to reports of sexual assault and domestic violence.
>
> b. Failing to adequately train officers and staff to appropriately respond to reports of sexual assault and domestic violence, including ensuring the officers employed investigative methods and techniques recognized as appropriate with victims of such violence.
>
> c. Retaining officers who failed to competently investigate allegations of sexual assault and domestic violence, including Lozano's report that Chafin had assaulted her twice.
>
> d. Retaining officers who demonstrated callous disregard and deliberate indifference to reports by victims of sexual assault and domestic violence.
>
> e. Retaining officers who actively mislead, discouraged and manipulated victims, including Lozano, from pursuing criminal investigations.
>
> f. Retaining officers who concealed violence committed by Baylor football players and who acted in concert with Baylor to shied players from prosecution and

public attention, thereby emboldening and empowering them to commit further violence.

202.    Waco PD's affirmative actions – its practice of misleading, discouraging and manipulating victims, concealing sexual assault and domestic violence committed by Baylor football players, and conspiring with Baylor and Baylor athletic department staff  – resulted in  a state-created danger that left Lozano at risk of being harmed by football players, including Chafin. The state-created danger was further increased when Waco PD ignored Lozano's report of felony assault and dismissed her concerns that Chafin had assaulted her twice within a matter of weeks. The danger was real. Following her report, Chafin assaulted Lozano a third time. But for Waco PD's actions creating the danger, Lozano may not have been assaulted at all.

203.    Until Lozano was contacted by news reporters in May 2016 after they received a partial copy of her April 2014 report of domestic violence, she was unaware of Waco PD's unlawful customs, policies and practices and was unaware of the causal link between these unlawful actions and the assaults she suffered while a student of Baylor and a resident of Waco.

204.    Waco PD's unlawful actions were committed willfully, knowingly and with specific intent to deprive Lozano of her constitutional rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

205.    The constitutional injury inflicted by Waco PD was caused by a person(s) with final policy making authority.  Now retired Chief Brent Stroman was police chief during all relevant times and upon information and belief Lozano alleges that Stroman knew about the above described conduct, facilitated it, condoned it, and/or turned a blind eye to it.

206.     In the alternative, Waco PD's actions and inactions demonstrate a continuing, widespread and persistent pattern of constitutional misconduct that constitutes an unofficial policy, custom or practice.

207.     As a result of Waco PD's violation of Lozano's constitutional right to Due Process, Lozano is entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated:  January 30, 2018                    Respectfully submitted,

*/s/ Sheila P. Haddock*
Sheila P. Haddock (#00790810)
sheila@zalkin.com
Alexander S. Zalkin (*pro hac vice*)
alex@zalkin.com
Irwin M. Zalkin (*pro hac vice*)
irwin@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiff Dolores Lozano*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

THE ZALKIN LAW FIRM, P.C.

*/s/ Sheila P. Haddock*
Sheila P. Haddock (#00790810)
sheila@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

Dated: January 30, 2018